Argued and submitted June 18, affirmed August 25, 2004

Keith CYRUS
and Matt Cyrus,
*Respondents,*

*v.*

DESCHUTES COUNTY,
*Respondent,*
*and*

CENTRAL ELECTRIC COOPERATIVE, INC.,
*Petitioner.*

2003-153; A124563

96 P3d 858

Gerald A. Martin argued the cause for petitioner. With him on the brief were Martin E. Hansen and Francis & Martin.

Brian L. Gingerich argued the cause for respondents Keith Cyrus and Matt Cyrus. With him on the brief were Tia M. Lewis and Merrill O'Sullivan, LLP.

No appearance for respondent Deschutes County.

Before Brewer, Presiding Judge, and Deits, Chief Judge, and Leeson, Judge pro tempore.

BREWER, P. J.

**BREWER, P. J.**

Petitioner Central Electric Cooperative, Inc. (CEC) seeks review of a Land Use Board of Appeals (LUBA) decision remanding Deschutes County's approval of CEC's request to alter a portion of its electric utility infrastructure. Because, as explained below, CEC challenges LUBA's interpretation of a governing statute, we review LUBA's conclusions in that regard for errors of law. ORS 197.850(9)(a); *Kelley v. Clackamas County*, 158 Or App 159, 165, 973 P2d 916 (1999).

We take the facts from the record and LUBA's order. *Cyrus v. Deschutes County*, 46 Or LUBA 703 (2004). In 1962, the Public Utility Commission (PUC) granted CEC exclusive authority to provide electric service for the Black Butte Ranch and Sisters areas in Deschutes County. Before 1972, when the county first adopted a zoning ordinance for those areas, CEC constructed transmission lines, including the "Jordan Road" line and other facilities. About half of the Jordan Road line crosses federal land, and the remainder crosses privately owned land. When CEC constructed the Jordan Road line, it obtained easements from the landowners over whose land the line crosses, including respondents Cyrus.

The Jordan Road transmission line currently is supported by 156 wooden poles ranging in height from 38.5 to 74.5 feet above ground and separated by an average of 400 feet. Most of the private property over which the line crosses is zoned exclusive farm use (EFU) or multiple-use agriculture (MUA). A short section of the line crosses land that is zoned for surface mining (SM). The county's zoning ordinance allows a "utility facility" as a conditional use in the EFU and MUA zones but not in the SM zone. CEC has no conditional use permit for the Jordan Road transmission line, and the parties and LUBA properly have regarded the line as a nonconforming use. *See Polk County v. Martin*, 292 Or 69, 74-76, 636 P2d 952 (1981) (holding that ORS 215.130(5) protects lawful uses that existed at the time that a zoning restriction became effective).

In 2003, CEC sought to make improvements to the Jordan Road transmission line. It proposed to install 190 poles made of weathered steel ranging in height from 64.5 to 83.5 feet above ground and separated by an average of 350 feet. In addition, CEC sought to upgrade the transmission line from 69-kilovolt to 115-kilovolt capacity and to install new conductors and lightning protection. CEC did not seek a conditional use permit for the improvements. Instead, it applied to the county for nonconforming use verification for the existing Jordan Road line and for permission to make the improvements. CEC asserted that it is entitled to make the improvements under ORS 215.130(5), which permits alteration of a nonconforming use "when necessary to comply with any lawful requirement for alteration in the use."[1]

---

[1] ORS 215.130 provides, in part:

"(5) The lawful use of any building, structure or land at the time of the enactment or amendment of any zoning ordinance or regulation may be continued. Alteration of any such use may be permitted subject to subsection (9) of this section. Alteration of any such use shall be permitted when necessary to comply with any lawful requirement for alteration in the use. Except as provided in ORS 215.215, a county shall not place conditions upon the continuation or alteration of a use described under this subsection when necessary to comply with state or local health or safety requirements, or to maintain in good repair the existing structures associated with the use. A change of ownership or occupancy shall be permitted.

"(6) Restoration or replacement of any use described in subsection (5) of this section may be permitted when the restoration is made necessary by fire, other casualty or natural disaster. Restoration or replacement shall be commenced within one year from the occurrence of the fire, casualty or natural disaster. If restoration or replacement is necessary under this subsection, restoration or replacement shall be done in compliance with ORS 195.260(1)(c).

"(7)(a) Any use described in subsection (5) of this section may not be resumed after a period of interruption or abandonment unless the resumed use conforms with the requirements of zoning ordinances or regulations applicable at the time of the proposed resumption.

"(b) Notwithstanding any local ordinance, a surface mining use continued under subsection (5) of this section shall not be deemed to be interrupted or abandoned for any period after July 1, 1972, provided:

"(A) The owner or operator was issued and continuously renewed a state or local surface mining permit, or received and maintained a state or local exemption from surface mining regulation; and

"(B) The surface mining use was not inactive for a period of 12 consecutive years or more.

"(c) For purposes of this subsection, 'inactive' means no aggregate materials were excavated, crushed, removed, stockpiled or sold by the owner or operator of the surface mine.

In May 2003, the county issued an administrative decision approving the application. Respondents appealed the administrative decision to the county hearing officer. In August 2003, after a public hearing on the application and the preparation of a written evidentiary record, the hearing officer affirmed the administrative decision. The hearing officer relied on ORS 757.020, ORS 757.669, and ORS 758.405,[2] which prescribe duties and obligations of public utilities, and he concluded that those statutes "impose on regulated utilities such as [CEC] a legal duty to provide safe, reliable and adequate electrical service to their customers." The hearing officer found that the proposed improvements were necessary to comply with that obligation. Based on that determination, the hearing officer concluded that CEC had demonstrated that the proposed improvements were justified by a "lawful requirement for alteration in the use" within the meaning of

---

"(8) Any proposal for the verification or alteration of a use under subsection (5) of this section, except an alteration necessary to comply with a lawful requirement, for the restoration or replacement of a use under subsection (6) of this section or for the resumption of a use under subsection (7) of this section shall be subject to the provisions of ORS 215.416 [regarding permit applications, notice, etc.]. An initial decision by the county or its designate on a proposal for the alteration of a use described in subsection (5) of this section shall be made as an administrative decision without public hearing in the manner provided in ORS 215.416(11).

"(9) As used in this section, 'alteration' of a nonconforming use includes:

"(a) A change in the use of no greater adverse impact to the neighborhood; and

"(b) A change in the structure or physical improvements of no greater adverse impact to the neighborhood."

[2] ORS 757.020 provides that every public utility is required to "furnish adequate and safe service, equipment and facilities, and the charges made by any public utility for any service rendered or to be rendered in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited."

ORS 757.669(1) provides that it is the policy of the state regarding consumer-owned utilities to "[p]reserve and enhance the ability of community-based consumer-owned utilities to provide reliable electric power to their consumers[.]"

ORS 758.405 is an introductory section to statutory provisions regulating utility providers. It provides:

"The elimination and future prevention of duplication of utility facilities is a matter of statewide concern; and in order to promote the efficient and economic use and development and the safety of operation of utility services while providing adequate and reasonable service to all territories and customers affected thereby, it is necessary to regulate in the manner provided in ORS 758.400 to 758.475 all persons and entities providing utility services."

ORS 215.130(5). The county board of commissioners declined to reconsider the hearing officer's decision. Respondents then appealed to LUBA.

LUBA rejected the county's interpretation of ORS 215.130(5). According to LUBA, that statute distinguishes between alterations that a county "may" permit and those it "shall" permit:

> "The latter are limited to alterations 'necessary to comply with any lawful requirement for alteration in the use.' Significantly, the 'lawful requirement' must be 'for alteration in the use.' That modifier suggests that it is not sufficient that some authority impose a general legal obligation on the nonconforming use owner; the authority must require the requested 'alteration [in the] use.' "

*Cyrus*, 46 Or LUBA at 709.

Based on that understanding, LUBA considered the 1962 PUC order granting CEC its service area. LUBA concluded that the order "does not purport to impose any relevant legal requirements, much less requirements for alterations of the use in question here." According to LUBA, the statutes that the hearing officer relied on impose only "a general obligation on [CEC] to provide safe, reliable, and adequate electrical service to its customers." LUBA concluded that "such a general, open-ended obligation is [not] a 'lawful requirement for alteration in the use' within the meaning of ORS 215.130(5)." Based on that conclusion, LUBA remanded the county's decision.

On review, CEC urges that the record shows that it must make the proposed improvements to its transmission lines in order to fulfill its obligation under ORS 757.020 to provide adequate, safe, and reliable electric service to its expanding base of customers. In its view, that obligation satisfies the "legal requirement" standard for altering a nonconforming use under ORS 215.130(5). CEC also relies on OAR 860-023-0090(1) and (4), sections of a PUC rule that direct electric utilities to use reasonable means to ensure reliable service and have a program for evaluating "and where appropriate, for correcting under performing circuits." CEC characterizes LUBA's ruling as requiring a PUC order directing construction of the improvements in order for a "legal

requirement" to exist within the meaning of ORS 215.130(5). CEC insists that no such specific or immediate directive is necessary.

The problem presented is one of statutory construction. We look first to the text and context of ORS 215.130(5) and then, if necessary, to its legislative history. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The term "lawful requirement" is not statutorily defined. In ordinary terms, "lawful" means "conformable to law : allowed or permitted by law : enforceable in a court of law[.]" *Webster's Third New Int'l Dictionary* 1279 (unabridged ed 1993). We conclude that the legislature intended that dictionary definition to serve as the meaning of "lawful" in ORS 215.130(5), because that definition is the natural and ordinary meaning of the word. *See State v. Ausmus*, 336 Or 493, 503-04, 85 P3d 864 (2003) (construing "lawful" in accordance with its dictionary meaning for purposes of ORS 166.025). "Requirement," in turn, means "something called for or demanded : a requisite or essential condition[.]" *Webster's* at 1929. Thus, a "lawful requirement" is a demand that is authorized by law. So understood, for purposes of ORS 215.130(5), the term appears to focus on what a governmental authority has demanded of the holder of a nonconforming use.

Under ORS 215.130, the holder may itself seek permission to make an alteration of a nonconforming use. *See* ORS 215.130(8) (referring to a "proposal" for the "alteration of a use"). However, that procedure for alteration of the use is limited to specific circumstances, namely, the restoration or replacement of a use that is necessitated by a fire or other casualty, or the resumption of a use after an abandonment or interruption. ORS 215.130(6), (7). Nothing in ORS 215.130 suggests that a use holder's own proposal for alteration of the use is otherwise sufficient to trigger the "lawful requirement" prerequisite set out in ORS 215.130(5). To conclude that such a proposal is sufficient would undermine the legislative purpose, apparent in the plain meaning of the statute, of restricting alterations of nonconforming uses to those that are lawfully demanded by a governmental authority. No authority,

lawfully or otherwise, has called on CEC to make the proposed improvements. Accordingly, those improvements were not sanctioned by ORS 215.130(5).

Nor does OAR 860-023-0090 support CEC's position. That rule sets out aspects of an electric utility's general duties in providing services; it does not address circumstances in which the utility is required to improve its infrastructure. It provides:

"(1)   An electric utility shall use reasonable means in design, operations, and maintenance to ensure reliable service to each customer. Such means shall include, but not be limited to, programs to prevent service interruptions.

"(2)   An electric utility shall have a program with written standards and written schedules to maintain appropriate reliability levels.

"(3)   When interruptions occur, each electric utility shall reestablish service with the shortest possible delay consistent with the safety of its employees, customers, and the general public.

"(4)   An electric utility shall have a program for analyzing, and where appropriate, for correcting underperforming circuits."

In short, nothing in the rule constitutes a "lawful requirement" to make the improvements proposed here.

If resort to legislative history were necessary to resolve the matter, that history, to the extent that it is pertinent, supports our conclusion. *See* ORS 174.020(1)(b). The subject provision was enacted in slightly different form by the 1977 legislature as part of ORS 215.130(4). Or Laws 1977, ch 766, § 5.[3] Then-Senator Fadeley explained that the provision was enacted "so that one governmental agency cannot move anyone off a nonconforming use by requiring the

---

[3] ORS 215.130(4) (1977) provided:

"The lawful use of any building, structure or land at the time of the enactment or amendment of any zoning ordinance or regulation may be continued. Alteration of any such use may be permitted when necessary to reasonably continue the use without increase and alteration of any such use shall be permitted when necessary to comply with any lawful requirement for alteration in the use."

person to change the structure and then to declare that the person cannot make that change under a nonconforming use." Minutes, Senate Environment and Energy Committee, June 23, 1977, 6.

That statement is consistent with the ordinary meaning of the term "lawful requirement" discussed above. It suggests that the legislature was concerned with preventing local governments from forcing the abandonment of a nonconforming use by denying approval of an alteration of the use when the alteration is required by that or another government agency. There is no indication in the quoted statement or elsewhere in the history of the provision that the legislature intended to permit the alteration of a nonconforming use based on the user's own request for permission to make the alteration for the purpose of complying with a general statutory obligation.[4]

Affirmed.

---

[4] Our affirmance of LUBA's decision based on ORS 215.130(5) makes it unnecessary to consider CEC's remaining assignment of error.